UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff/Respondent,<br><br>            v.<br><br>MICHAEL DAVID BOOTH,<br><br>        Defendant/Petitioner. | NO. CR-99-0018-EFS<br>(NO. CV-07-0387-EFS)<br><br>**ORDER DENYING MR. BOOTH'S PETITION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE AND DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY** |

From June 3 to 8, 2010, the Court conducted a hearing on Petitioner Michael David Booth's Petition Under 28 U.S.C. § 2555 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("Petition"). (ECF No. 359.)  Mr. Booth asserts the broadest and most comprehensive attack possible on the effectiveness of trial counsel, Jeffrey Finer, both before and at trial.[1]  Peter R. Ginsburg and Stephen Drummond

---

[1]  Before the habeas-corpus hearing, the Court granted the USAO's Motion to Strike or Dismiss Newly-Filed Allegations of Incompetence. (ECF No. 574.)  That precluded evidence and consideration of 1) Mr. Finer's alleged failure to argue that wire-fraud and money-laundering charges were invalidly merged; 2) Mr. Finer's alleged failure to argue or seek a jury instruction that a conviction on a specific money-laundering prohibition must be based on an unanimous verdict; and 3) Mr. Finer's

ORDER ~ 1

appeared for Mr. Booth.   Assistant U.S. Attorney (AUSA) Thomas Rice appeared for Respondent United States of America (USAO).   The Court listened to the testimony of witnesses called by both parties and reviewed the docket, filings, evidence, and its habeas-corpus-hearing notes.   The Court also recalled some enduring memories of this 2000 trial. For the reasons set forth below, the Court denies Mr. Booth's Petition.

**A.    Standard**

The right to effective assistance of counsel in criminal proceedings is bestowed by the Sixth Amendment.   U.S. Const. amend. VI.   This right is violated when 1) counsel's performance fell below an objective standard of reasonableness and 2) this deficiency prejudiced the criminal defendant.   *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Under *Strickland*'s first prong, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."   *Id.* at 687.   "In making this determination, the court should keep in mind that counsel's function, as

---

alleged failure to seek exclusion of prejudicial prior-bad-act evidence. Any discussion referring in part to these issues in this Order does not revive them or indicate that this Court has changed the ruling on those issues.   However, the Court notes that Mr. Finer did propose a jury instruction that money spending was not money laundering (ECF No. 123, no. 13), which the Court declined to give and that he also vigorously argued a motion on the Rule 404(b) issue.

1  elaborated in prevailing professional norms, is to make the adversarial
2  testing process work in the particular case." *Id.* at 690.

3      This assessment is deferential to defense counsel, and there is a
4  strong presumption that counsel's conduct falls within the range of
5  reasonable professional assistance. *Id.* at 689; *United States v. Mejia-*
6  *Mesa*, 153 F.3d 925, 931 (9th Cir. 1998).   Also, counsel's decisions are
7  "examined according to what was known and reasonable at the time the
8  attorney made his choices." *Hendricks v. Calderon*, 70 F.3d 1032, 1036
9  (9th Cir. 1995).   Accordingly, to satisfy *Strickland*'s first prong, a
10 defendant must overcome the presumption that, given the circumstances of
11 the case, counsel's performance was a sound trial strategy. *Strickland*,
12 466 U.S. at 689.

13     Yet, to be considered a constitutionally-sound strategic choice,
14 counsel's reasonable strategy must have been informed by a reasonable
15 investigation. *Id.* at 691; *Jones v. Wood*, 114 F.3d 1002, 1010 (9th Cir.
16 1997). Therefore, counsel must conduct pretrial investigation and
17 preparation. *Richter v. Hickman*, 578 F.3d 944, 951 (9th Cir. 2009),
18 *cert. granted*, 130 S. Ct. 1506 (U.S. Feb. 22, 2010); *see also United*
19 *States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983).   "Courts have
20 repeatedly stressed the importance of adequate consultation between
21 attorney and client, the interviewing of important witnesses, and
22 adequate investigation of potential defenses." *Tucker*, 716 F.2d at 581.
23 "A lawyer who fails adequately to investigate, and to introduce into
24 evidence, [evidence] that demonstrate[s] his client's factual innocence,
25 or that raise[s] sufficient doubt as to that question to undermine
26 confidence in the verdict, renders deficient performance." *Avila v.*

*Galaza*, 297 F.3d 911, 919 (9th Cir. 2002) (citing *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999)).   Further, counsel is not "presumed" to have made an "informed" strategic decision regarding which witnesses to call if he has not interviewed witnesses.   *Riley v. Payne,* 352 F.3d 1313, 1324 (9th Cir. 2003).

In essence,

> Until a reasonable investigation is conducted, counsel is not in a position to make critical strategic decisions or settle on a trial strategy–certainly including the decision to rest on his client's testimony irrespective of the forensic facts. We have repeatedly held that "[a]n uninformed strategy is not a reasoned strategy," *Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir.2008), *cert. denied sub nom. Schriro v. Correll*, --- U.S. ----, 129 S.Ct. 903, 173 L.Ed.2d 108 (2009), and we have followed the Supreme Court's holding that "the traditional deference owed to the strategic judgments of counsel is not justified where there was not an adequate investigation 'supporting those judgments,'" *id.* at 948-49 (quoting *Wiggins*, 539 U.S. at 521, 123 S.Ct. 2527).

*Richter*, 578 F.3d at 955.

Under the second *Strickland* prong, a criminal defendant must show prejudice, i.e., there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.   "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," then prejudice is presumed and need not be shown.   *United States v. Cronic*, 466 U.S. 648, 659 (1984) (citing *Davis v. Alaska*, 415 U.S. 308, 318 (1974)).   Apart from circumstances of that magnitude, a defendant must "show how specific errors of counsel undermined the reliability of the finding of guilt."   *Id.* at 659 n.26.   Acquittals on some counts support an inference that the jury sorted through the evidence and considered each count separately.   *United States v.*

1  *Richards*, 204 F.3d 177, 194 (5th Cir. 2000), *overruled on other grounds*
2  *by United States v. Cotton*, 535 U.S. 625 (2002).

3  **B.   Brief Case History**

4      In early 1999, Mr. Booth was arrested and indicted for eleven wire-
5  fraud counts (Counts 1-11) in violation of 18 U.S.C. § 1343, ninety-four
6  money-laundering counts (Counts 12-105) in violation of 18 U.S.C. § 1956,
7  and one count of conspiracy (Count 106) in violation of 18 U.S.C. § 371.
8  His co-defendant Louis Bories was indicted for these same counts.[2] (EDWA
9  No. CR-99-019-EFS.)

10      After a number of continuances, the jury trial began approximately
11  eighteen months later on August 7, 2000.  On August 24, 2000, the jury
12  acquitted Mr. Booth of wire-fraud Counts 1 and 9; money-laundering Counts
13  12-20, 75-78, and 80-83; and conspiracy Count 106.[3]  The jury convicted
14  him of wire-fraud Counts 2-8 and money-laundering Counts 21-74 and 84-
15  105.  In all, Mr. Booth was convicted on seven of nine wire-fraud counts
16  and eighty-seven of 103 money-laundering counts, while acquitted of two
17  wire-fraud counts, seventeen money-laundering counts, and the conspiracy
18  count.  In comparison, Mr. Bories was convicted of five of nine wire-
19  fraud counts and acquitted of the remaining counts.  After sentencing,
20  several appeals followed with which the parties are familiar; there is no
21  need to detail those appeals. The Court finally sentenced Mr. Booth on
22  April 20, 2005, to 160 months on the money-laundering counts concurrent
23  with sixty months on the wire-fraud counts, $8,500.00 in special

24  ───────────────

25      [2]  Mr. Bories was appointed counsel, Gerald Smith.

26      [3]  Count 79 was dismissed pretrial on the USAO's motion.

ORDER ~ 5

assessments, $2,153,582.00 in restitution, and forfeiture of several jewelry items.

**C.   Findings of Fact**

    1.   <u>Pretrial Challenges</u>

In early 1999, after his arrest and indictment, Mr. Booth retained Garrick Lew, a California attorney who shortly thereafter associated Mark Vovos, a reputable Spokane criminal-defense attorney.  In June 1999, Mr. Booth replaced these two attorneys with Robert Cossey, another reputable Spokane criminal-defense attorney.  Later in December 1999, Mr. Cossey associated Mr. Finer to assist with Mr. Booth's defense.  Mr. Booth had then been represented by retained counsel, other than Mr. Finer, for at least nine months.  And Mr. Cossey did not withdraw from the case until April 2000.  None of these three prior retained counsel provided affidavits in support of Mr. Booth's Petition nor did either party attempt to call them as witnesses at the  § 2255 hearing.  Therefore, except for docket information about the motions filed and Orders entered, including several Orders granting defense motions to continue trial (ECF Nos. 23, 42, 53, & 56), nothing is known about the state of investigation and trial preparation throughout 1999.

Both Mr. Cossey and Mr. Finer were concerned about Mr. Booth's competency and ability to communicate with them as is evidenced by the fact that both filed motions to determine Mr. Booth's competency, though Mr. Cossey withdrew his motion.  (ECF Nos. 46, 49, 50, & 59.)  In Mr. Cossey's motion, he said:

    3.   Since my representation began, I have had numerous discussions with my client concerning his defense.  I am concerned as to his ability to adequately relay

> information to me, as his attorney, necessary to prepare his defense.
>
> 4.   Considering the complexity of the charges, and the absolute necessity that I understand what information is reliable from the Defendant in order to prepare a defense, I feel it is vital that I make the request for a psychological examination.

(ECF No. 46, at 2 & 3.)   Later, upon Mr. Finer's motion, the Court ordered an examination and reports pursuant to 18 U.S.C. §§ 4241 and 4247 with a hearing on May 25, 2000, later set to May 26, 2000, if needed. Those reports were timely received; no such hearing was held because none was needed.   Hence, Mr. Booth's competency was not and is not an issue. It does show though that two different attorneys were concerned about Mr. Booth's ability to convey to them just what had occurred; this is informative, if only be inference, that Mr. Finer's much maligned defense-strategy was to adopt simplicity because Mr. Booth most certainly had to take the stand.

In January 2000, in his Affidavit of Counsel Re: Motion to Continue, Mr. Finer notified the Court that his existing cases and teaching responsibilities did not permit his attendance at the May trial to assist Mr. Cossey.   (ECF No. 55.)   Mr. Finer implied that he would withdraw if the trial date could not be moved to a later date. *Id.*   It is clear from Mr. Finer's affidavit that he had originally been associated "to assist in any appellate matters arising during the course of trial." *Id.* at 1, ll. 25-26.   This is evidence of Mr. Finer's willingness to continue the trial date if it conflicted with his other responsibilities and, if necessary, withdraw.

///

ORDER ~ 7

2.   <u>Mr. Booth's Prior Bad Acts</u>

In March 2000, Mr. Finer filed a Motion in Limine (ECF No. 62) and an Affidavit of Counsel re: Motion in Limine (ECF No. 63).   In the affidavit, Mr. Finer comments on the contents of the USAO's discovery, which included information not only of Mr. Booth's prior conviction for Conspiracy to Commit Offenses against the United States in violation of 18 U.S.C. 371 — the same offense as Count 106 —, but also detailed information about "up front fee" swindles "in which the Defendant allegedly obtained a fee in advance of performing some negotiated service and then failed to perform the service or return the fee." (ECF No. 63, at 2.)  Mr. Finer understood the USAO would try to use this prior conduct as Federal Rule of Evidence 404(b) material, though he did not explicitly cite the rule, to prove *mens rea* and sought to limit its use to avoid undue prejudice to Defendant.   Inferentially, Mr. Finer recognized that the USAO would use the prior bad acts, and he sought to limit the prejudice to Mr. Booth.

The prior conviction for the same crime as charged in Count 106 presented the problem of how to deal with that at trial, particularly because Mr. Booth most certainly had to take the stand to explain the numerous conversations and promises with government witnesses.   These witnesses would describe Mr. Booth's promises as lies, forming the bases for the wire-fraud counts.  Mr. Booth charges Mr. Finer with mishandling this issue.   The Court disagrees.   While it could be argued that the conviction was too prejudicial per Rule 403 because it involved the same type of advance-fee procedure and that Mr. Finer should have moved in advance of trial for a ruling, the Court would have permitted the use of

it per Rule 609 with a limiting instruction.  That AUSA Rice referenced the prior conviction in his opening, a risky gambit, without an objection from Mr. Finer, is not ineffective assistance of counsel.  With the certainty that Mr. Booth would testify, conventional wisdom is to diffuse it in opening.  That it was done by the AUSA does not mean Mr. Finer's assistance was ineffective.  In fact, Mr. Finer's opening statement evidences his preparation to deal with that prior conviction and those prior bad acts.

3.  <u>Sentencing Information</u>

At the § 2255 hearing, Mr. Booth testified that Mr. Finer told him that even if he was convicted that he would face only two or three years in a white collar prison camp.  Susan Whaley testified that Mr. Finer told her the same thing during the mock-trial presentations.  The Court does not find Mr. Booth credible on this point and believes that Ms. Whaley is simply remembering only part of the conversation.  It is standard procedure in the Eastern District of Washington for each offense's penalty slip to be part of the file and for the magistrate judge to recite the penalty both at first appearance and arraignment.  In addition, Mr. Booth's two retained Spokane attorneys before Mr. Finer are very experienced criminal defense attorneys who frequently appear in this Court.  This Court firmly believes that both they and Mr. Finer acquainted Mr. Booth with the penalties he was facing if convicted on the wire-fraud and money-laundering counts.  There was no ineffective assistance of counsel on this point.

///

4.   <u>Lease-Financing Industry</u>

Mr. Booth was acquitted of seventeen money-laundering counts and convicted of seventy-six money-laundering counts.  Mr. Booth argues that Mr. Finer was ineffective both pretrial and at trial because he did not do enough and did not understand the nature of the lease-financing business: Mr. Booth and his legal team attack virtually all of Mr. Finer's pretrial and trial activity.  But to put Mr. Finer's actions in context, it is necessary to examine the docket report, filings, and evidence.

To begin, the Court describes the circumstances facing Mr. Finer when he associated in December 1999.  As mentioned above, Mr. Booth was a felon convicted in December 1995 of the same crime charged in Count 106 by engaging in an advance-fee scheme whereby he would receive advance fees for financing leases with no intention, or capacity, to finance such; Mr. Booth then converted the advance fees to his personal use.  Mr. Finer anticipated that this conviction would be used to impeach Mr. Booth when he testified; and based on the discovery, he would certainly have to testify because his customers and other witnesses would testify as to the alleged money-laundering scheme. Further, the USAO produced evidence that on January 7, 1999, virtually none of that money was in the LeasX accounts, that witnesses would testify that tens of thousands of dollars were spent on expensive automobile leases, on chartering a jet with many trips to Las Vegas, and on jewelry.  This does not include what representatives would testify to about their dealings with Mr. Booth and Mr. Bories nor many other facets of the case but gives a perspective to the challenge facing Mr. Finer.  And in fact at trial, the USAO produced

evidence that between late 1997 and early January 1999, LeasX and Mr. Booth, who was on supervised release for his 1995 conviction, were paid $1,968,000.00 from the five identified corporations, but that no major financing, other than one for $100,000.00, had been provided to those five corporations.  While Mr. Booth and his legal team criticize Mr. Finer's strategy of 1) defeating the wire-fraud counts without aggressively attacking the money-laundering counts, 2) keeping it simple so Mr. Booth could explain his persistent efforts to produce financing, and 3) not spending more time interviewing defense witnesses in advance of trial, Mr. Finer chose the strategy which in his judgment had the best potential to defeat the wire-fraud counts: show the jury that legitimate and respectable businesses were working with Mr. Booth on major financing deals for his clients and that he was on the verge of closing those deals when the FBI arrested him, resulting in a catastrophe for LeasX clients. If the jury acquitted on the wire-fraud counts, that would eliminate the money-laundering counts, the weakest part of the defense because of the very negative evidence on that issue.  To argue now that "money spending is not money laundering" was a winning argument ignores the fundamental problem with the facts presented to the jury: clients sent Mr. Booth $1,968,000.00 to obtain financing for their businesses, most clients received no financing, and all of that money was nowhere to be found when Mr. Booth was arrested.

While Mr. Smith, the attorney for Mr. Bories, did argue that money spending is not money laundering, and Mr. Bories was acquitted of the money-laundering counts, that does not mean Mr. Finer was ineffective in choosing not to argue that issue.  First, Mr. Smith did argue it

generally; second, the jury did acquit Mr. Booth of seventeen money-laundering counts; and third, there was strong evidence that Mr. Bories was a dupe for Mr. Booth, was bankrupt, and other than salary, had not received any of the money moved from one bank account to another at the direction of Mr. Booth.

5.   <u>Action Taken by Mr. Finer</u>

Next, an examination shows that after being associated by Mr. Cossey, an experienced criminal-defense attorney, for the purpose of developing appellate issues, Mr. Finer:

1.   objected to the Court's resetting of the trial to February 2000 and then to May 2000, on the basis of defense counsels' work load and trial and teaching calendars, which resulted in the August trial setting;

2.   contacted government witnesses—some spoke with him, others refused—implying that he had familiarized himself with all or most of the voluminous discovery provided by the USAO in order to be able to converse with and cross examine those government witnesses;

3.   moved for and obtained a competency exam of Mr. Booth, which was completed with reports submitted to the Court;

4.   filed a motion on Federal Rule of Evidence 404(b) evidence;

5.   moved for and obtained Mr. Booth's pretrial release for the purpose of preparing the case for trial since he knew the details of LeasX's operation and the lease-financing industry;

6.  had Mr. Foster, a legal intern and a former state trooper, organize boxes of material and prepare trial files and computer data files;

7.  retained the services of Ms. Whaley, who assists attorneys with preparing demonstrative trial exhibits and mock trials;

8.  conducted mock trials to understand the jury's reaction to specific issues until the mock jury acquitted Mr. Booth, who testified at the mock trials;

9.  developed a demonstrative trial exhibit to explain the chronology of LeasX and Mr. Booth's actions;

10. developed a strategy to defeat the wire-fraud counts, which would eliminate a conviction on the money-laundering counts- that strategy included simplifying the theme for jury consumption rather than hiring experts and complicating Mr. Booth's defense;

11. talked with several defense witnesses, who were identified by Mr. Booth as important to the case, pretrial;

12. worked nights and weekends with Mr. Booth before and during trial;

13. consistent with his strategy of attacking the wire-fraud counts, prudently did not cross-examine some government witnesses where it would be folly to do so because it would emphasize Mr. Booth's transfer of LeasX funds thereby supporting the money-laundering counts, such as 1) Mr. Barcelo, who would reinforce the message that Mr. Booth was committing wire fraud; 2) Ms. Schmitz, who worked at LeasX from July to

December 1998 at a net salary of $3,800.00 per month to set up a telemarketing department, but left because it did not get done; 3) Ms. Schanley of Business Aviation, who testified about LeasX's frequent use of a chartered private jet to fly to Las Vegas in 1998; 4) Mr. Coombs, the former manager of a Toyota dealership, where LeasX leased two Toyota Land Cruisers at $1,000.00 each per month in the spring and summer of 1998; 5) Mr. Fix of Dodson's Jewelers where in 1998 Mr. Booth purchased much of the jewelry later forfeited; and 6) Mr. Mende, a cyclist put on LeasX's payroll as Mr. Booth's personal trainer in 1998;

14. vigorously cross-examined the key government witnesses such as Mike Mattish of Crawford Forest Products, Bruce Irvine of Irvine Flexible Packaging, Philip Chasmar of 21st Century Telesis, and Clyde Williams and Kenneth Turner both of Advanta, demonstrating 1) knowledge of pertinent LeasX documents which he introduced during those cross-examinations, 2) understanding of broker commissions in the Advanta transactions, and 3) familiarity with a) the difference between discounting and brokering in the leasing industry and b) with Advanta-LeasX communications and documents and Advanta's ACE system;

15. objected, often persuasively, on evidentiary points;

16. filed Federal Rule of Criminal Procedure 29 dismissal motions;

17.  proposed jury instructions favorable to Mr. Booth's view of the law and evidence, including one that money spending is not money laundering;

18.  consistent with his emphasis on concentrating on persuading the jury of doubt on the wire-fraud counts, let counsel for Mr. Bories make the money-laundering argument, presumably because the evidence was that almost as soon as a fee was paid into the LeasX account, Mr. Booth directed Mr. Bories to transfer the money to another account from which it was then withdrawn; and

19.  gave a spirited, if not dramatic, closing argument using the demonstrative exhibit which had resulted in an acquittal at mock trial and achieved acquittals on two wire-fraud counts and seventeen money-laundering counts.

While the Court does not actually remember the closing language Mr. Finer used without reference to the transcript, it does remember that one-by-one Mr. Finer tore sheets, which represented a single issue, from the demonstrative exhibit, flinging them to the courtroom floor, thereby "rejecting" the USAO's evidence admitted to prove each.

6.  Mr. Finer's Alleged Witness Failures

Mr. Booth complains that he did not spend adequate time pretrial with, among others, Mr. Hill and Mr. Kontomitras, and failed to effectively cross-examine Mr. Chasmar. Every trial attorney must make decisions on how to allocate time with witness preparation. Mr. Finer met with Mr. Hill and Mr. Kontomitras the night before trial but both complain that they felt unprepared for testimony. The criticism focuses on what else Mr. Finer might have done with these defense witnesses.

ORDER ~ 15

Though Mr. Booth criticizes Mr. Finer for his lack of knowledge on a myriad of issues, the transcript shows he was knowledgeable, although perhaps not to the degree that would satisfy Mr. Booth.

At the § 2255 hearing, Mr. Hill's criticism of Mr. Finer regarding the two other Advanta witnesses, Clyde Williams and Kenneth Turner, is simply a matter of his disagreement with their perspectives about the viability of doing business with LeasX.  In 1998, Mr. Hill was new to Advanta and tasked with opening a west-coast office and producing millions of dollars in business.  Mr. Booth offered Mr. Hill the possibility of producing business, but Mr. Hill's testimony confirmed that Mr. Booth actually produced little, just as Mr. Turner had testified to.  On cross-examination, Mr. Rice demonstrated that Mr. Hill was unaware of Mr. Booth's conviction or that LeasX was being sued by its leads-producing telemarketing company: both important factors in determining whether Advanta would do business with LeasX, let alone whether Advanta would give LeasX an advance line of credit for millions of dollars.  It was obvious from Mr. Hill's demeanor and tone at the § 2255 hearing that he was shocked by these negative facts, which would have negatively impacted Advanta's relationship with Mr. Booth and LeasX.

At trial, Mr. Finer's direct examination of Mr. Hill covered positive points in the relationship, including Mr. Hill's favorable impression of the telemarketing business model that Mr. Booth was creating; the earnest, if constant, inquiry from Mr. Booth about potential deals; LeasX's volume of applications; the potential for completing an approximately $5,000,000 deal for Quad Cities; and the dramatic effect that Mr. Booth's arrest had on the LeasX deals being

ORDER ~ 16

reviewed by Advanta, which would have resulted in first and last payments to LeasX in the hundreds of thousands of dollars. The Court finds Mr. Finer was not ineffective as to Mr. Hill. Mr. Finer had a difficult task of deciding what to elicit from a witness consistent with the theme of his strategy of defending Mr. Booth.

As to Mr. Kontomitras, it is clear to the Court from observing the testimony of both Mr. Finer and Mr. Kontomitras at the § 2255 habeas hearing that they are extremely different people, who are unlikely to be comfortable with each other. It is unsurprising that they have different views of their meeting the night before trial. Mr. Kontomitras is about the art of the deal. He wants to make deals; it produces income for the company he then happens to be working for and high commissions for himself. That's his world — deal making, not dealing with lawyers and testifying in court. He criticizes Mr. Finer for not preparing him for trial. Mr. Finer in turn is critical of Mr. Kontomitras' behavior when he arrived the night before testifying. The transcript of Mr. Konomitras' trial testimony demonstrates that he was an instructive witness on his business, lucidly explaining how it works for all of the parties involved. Mr. Finer asked simple questions; Mr. Kontomitras responded with helpful information that the jury could understand about his contacts with Mr. Booth and Mr. Barcelo on the potential for doing a deal involving 21st Century, Winstar, and LeasX. His testimony about the viability of using insurance to wrap a deal was helpful to show that Mr. Booth was trying to make the 21st Century deal work even if it required Mr. Booth to find an insurance company to guarantee the deal. This demonstrated that Mr. Booth was genuinely trying to make the 21st Century

deal work, rather than trying to defraud anyone, and that Mr. Kontomitras took him seriously and respected his ideas.

Again, the criticism is that Mr. Finer did not show that the deal could not be done in thirty days but rather realistically showed that a deal is done in stages. Mr. Finer's announced strategy was to show the jury that, but for the action of the FBI arresting Mr. Booth in January 1999, he would have been able to produce the financing for 21st Century and others. Mr. Finer wanted to establish that only the agreements to do the deal could be done in thirty days; that the deal's implementation would take longer was not the point. Mr. Finer elicited testimony that Mr. Booth's methods were viable and that he was genuinely involved in an acceptable approach to putting together the deal.[4]  That Mr. Booth believes there was a better way to defend him at trial does not make Mr. Finer's approach ineffective.

Mr. Booth criticizes Mr. Finer's cross-examination of Mr. Chasmar of 21st Century Telesis as inadequate, but the transcript is to the contrary. Mr. Finer was knowledgeable and savvy in the details and benefits to 21st Century Telesis and its relationship to LeasX.  Mr. Finer effectively used exhibits during cross-examination and was persistent in eliciting

---

[4]  An unexpected benefit of Mr. Kontomitras' testimony was the depiction by him of Mr. Barcelo as biased against Mr. Booth.  Mr. Kontomitras considered Mr. Barcelo a disgruntled employee who left LeasX because of a pay issue and who was trying to cut a side deal with Mr. Kontomitras if he could produce Winstar as a client.

ORDER ~ 18

testimony that Mr. Chasmar did not have a letter demanding refund of the advance fee.

7.  <u>Mr. Finer's § 2255 Hearing Testimony</u>

As to Mr. Finer's testimony at the § 2255 hearing, which was ten years after the trial and without the voluminous trial transcript to review or any duty to do so, his testimony is understandably weak in some areas.  For example, Mr. Foster, then a legal intern, did not interview witnesses as Mr. Finer thought he did.  However, the Court finds that Mr. Finer did preserve his files for years, provided copies of his files to Mr. Booth twice, and prepared trial folders for each witness though he no longer has these folders.  This last finding is based on the trial transcript which evidences that Mr. Finer had extensive knowledge of the LeasX transactions at issue and effectively used exhibits with many of the witnesses.  While Mr. Booth makes a point that Mr. Finer did not interview a number of witnesses, it is clear that Mr. Finer unsuccessfully attempted to interview several witnesses by phone and actually did successfully telephonically interview some witnesses.  Yet, the voluminous discovery provided by the USAO, including witness statements, and the availability of Mr. Booth to provide Mr. Finer with helpful information about many of the witnesses does not mean that he was ineffective by deciding to allocate his time where he thought best.  *See Riley v. Payne*, 352 F.3d 1313, 1318 (9th Cir. 2003) ("[C]ounsel need not interview every possible witness to have performed proficiently.") (citing *LaGrand v. Stewart*, 133 F.3d 1253, 1274 (9th Cir. 1998) (concluding there was no prejudice where trial counsel had personally

interviewed the one eyewitness and read investigative reports and transcripts of interviews with all other witnesses)).

8.  <u>Mr. Booth</u>

The other enduring trial memory is that Mr. Booth was a poor witness for himself.  Ten years later at this § 2255 hearing, the Court finds Mr. Booth not credible on the issues of 1) his interaction with Mr. Finer in preparing for trial, 2) the number of hours spent with Mr. Finer, 3) heated conversations with Mr. Finer leading up to trial, 4) not criticizing Mr. Bories during trial, 5) not talking to him at counsel table, and 6) Mr. Finer not understanding LeasX business or Mr. Booth's relationship with Mr. Bories.  Mr. Booth retained three lawyers before Mr. Finer and a cadre of attorneys during the appellate process since firing Mr. Finer.  That convinces the Court that, if Mr. Booth was dissatisfied with Mr. Finer's preparation, he would have retained another attorney to try the case.  Plus, effective counsel seeks to avoid unnecessary disputes at trial with a co-defendant, who can turn into a witness for the USAO if made insecure.  In addition, no lawyer concentrating on the testimony of an adverse witness wants distraction.

Also, during AUSA Rice's cross-examination of Mr. Booth at the § 2255 hearing, Mr. Booth both by tone and manner was deceptive and vague on a variety of issues, including his explanation of the "whiteouts" on LeasX documents and his dealings and correspondence with Irvine Flexible Packaging and Crawford Forest Product.  AUSA Rice introduced and examined Mr. Booth on the May 6, 1998 letter (Trial Ex. 1, p. 12) and May 8, 1998 agreement (Trial Ex. 2, p. 30) between LeasX and Irvine Flexible Packaging and thoroughly impeached his credibility on those issues.

ORDER ~ 20

9.   <u>Factual Finding Summary</u>

In sum, based on the findings of fact, the Court finds that Mr. Finer strategically and adequately investigated and prepared Mr. Booth's defense and defended Mr. Booth vigorously at trial.   *See Tucker*, 716 F.2d at 581 (recognizing that counsel's choice of a trial strategy must be based on an adequate investigation).   Mr. Finer firmly identified his strategy as attacking the USAO's case on the wire-fraud counts because, if there was no conviction on those, there would be no money-laundering convictions, and he chose to allow Mr. Smith to discuss the absence of money-laundering evidence and that money spending was not money laundering.

The burden of proving guilt is on the USAO; a defendant has no burden of proof at all.   As a practical matter, defense counsel in a criminal case rarely, if ever, makes an effort to prove innocence. Rather, defense counsel attempts to persuade the jury that there is insufficient evidence to convict, i.e., that there is a reasonable doubt. It is left to defense counsel to choose a trial strategy that he believes may well produce an acquittal.   That is the reason why there is a strong presumption that counsel's performance fell within the range of reasonable professional assistance.   *Strickland,* 466 U.S. at 689.   Here, the Court finds that Mr. Booth has not overcome that presumption and, therefore, has failed to prove the first *Stickland* prong.   Mr. Finer did not provide ineffective assistance of counsel to Mr. Booth.

Assuming arguendo that, despite the Court's explicit findings of fact that Mr. Finer's investigation, preparation, and presentation were reasonable and adequate, his performance was ineffective, the Court finds

that there is no reasonable probability that but for this hypothetical ineffectiveness the result of the trial would have been different. The jury acquitted Mr. Booth on two of nine wire-fraud counts and seventeen of 103 money-laundering counts. That demonstrates that the jury considered all of the evidence and made discrete decisions on each count, some of which were favorable to Mr. Booth. *See Richards*, 204 F.3d at 194. In the course of a little over a year, Mr. Booth took in almost $2,000,000.00 and produced only one single $100,000.00 funding deal; the rest were far less than that single deal. None of the almost $2,000,000.00 was left upon his arrest in January 1999. Further, Mr. Booth had a recent prior federal felony conviction for similar conduct, and the testimony of his deceitful behavior by several desperate LeasX customers was compelling.

**D.    Conclusions of Law**

Having found that Mr. Booth failed to carry his *Strickland* burden on either prong, the Court **denies** the Petition as matter of law. Based on the above findings of fact and conclusions of law, the Court declines to issue a certificate of appealability because Mr. Booth failed to substantially show that his Sixth Amendment right to effective assistance of counsel was denied, and the Court believes that reasonable jurors would agree with the Court's findings and conclusions. 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

///

///

//

/

**E.    Conclusion**

For the above-given reasons, **IT IS HEREBY ORDERED**:

1.    Petitioner Booth's Petition Under 28 U.S.C. to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody **(ECF No. 359)** is **DENIED**.

2.    The Court **DECLINES** to issue a certificate of appealability on the issue of whether Mr. Booth was denied his Sixth Amendment right to effective assistance of counsel.

**IT IS SO ORDERED.**    The District Court Executive is directed to enter this Order and provide a copy of this Order to counsel.

**DATED** this ____23rd____ day of December 2010.


            _____S/ Edward F. Shea_____
                  EDWARD F. SHEA
            United States District Judge

Q:\Criminal\1999\0018.habeas.order.12.23.wpd

ORDER ~ 23